EDWARD S. STOKES, Appellant, *v.* WILLIAM E. D. STOKES, Respondent.

1. CONTRACT — SPECIFIC PERFORMANCE. A contract must possess certain elements in order that a court of equity may exercise jurisdiction to compel its performance: it must be upon a valuable consideration; it must be reasonably certain as to its subject-matter, its stipulations, its purposes, its parties and the circumstances under which it was made; it must be, in general, mutual in its obligations and its remedy.

2. CONTRACT — SPECIFIC PERFORMANCE. Where a clause in a contract, made between E. S. and W. S. in contemplation of their becoming the owners of the stock of a certain hotel corporation, stated that E. S. had deposited a specified amount of the bonds of the corporation with W. S. as collateral security for certain guarantees and other obligations, and it appeared that the full amount of such bonds had not in fact been so deposited, *held*, on consideration of the entire contract and of the surrounding circumstances, that a case was not presented calling for the enforcement, by equity, of the deposit with W. S. of the additional bonds called for — it appearing that, through the refusal of a third party to sell all the stock owned by him, W. S. had not been able to carry out the understanding of the parties as to obtaining substantially entire control of the corporation, which formed the real consideration for the deposit with him of the additional security.

*Stokes* v. *Stokes* (75 Hun, 193), reversed.

(Argued February 24, 1896; decided March 13, 1896.)

APPEAL from order of the General Term of the Supreme Court in the first judicial department, made January 15, 1894, which reversed, as to the counterclaim, a judgment entered upon a decision of the court on trial at Special Term dismissing the plaintiff's complaint and a counterclaim of the defendant, and granted a new trial.

The nature of the action and the facts, so far as material, are stated in the opinion.

*James C. Carter* and *Esek Cowen* for appellant. The construction of the contract by the General Term was erroneous. (*Russell* v. *Allerton*, 108 N. Y. 288; Schouler on Bailments, § 249; *Donil* v. *Eaton*, 35 Mich. 302; *Slocum* v. *Closson*, 1 How. App. 705, 758.) The notes for $34,300 and the two Read notes were all secured by collateral and were all in existence long before this contract was made, and their mere existence was no consideration whatever and would not support an executory promise to deliver additional security. A past consideration is not sufficient to support an express promise. (*Chamberlain* v. *Whitford*, 102 Mass. 448; *Summers* v. *Vaughn*, 35 Ind. 323; *Barlow* v. *Smith*, 4 Vt. 139; *Hopkins* v. *Richardson*, 9 Gratt. 485; *Bulkly* v. *Landon*, 2 Conn. 404; *Hopkins* v. *Logan*, 5 M. & W. 241; *Roscorla* v. *Thomas*, 3 A. & E. [N. S.] 234.) The complaint was rightfully dismissed for the reason that the contract was not mutual, and in case of a breach by the defendant no action for a specific performance could have been maintained by the plaintiff. (Pom. on Spec. Perf. § 163; *Duval* v. *Myers*, 2 Md. Ch. 401; *Morris* v. *Fox*, 45 Fed. Rep. 406.)

*Benjamin F. Tracy* for respondent. Where a defendant has actually received the consideration of an agreement, it is no answer to an action against him for a breach of his covenants in the same to say that the agreement did not bind the plaintiff to perform the promises on his part therein contained, if in fact it appears that the promises in question have been performed in good faith and without prejudice to the

defendant. (*Morton* v. *Burn*, 7 Ad. & E. 19; *Storm* v. *U. S.*, 94 U. S. 42.) The objection of a want of mutuality at the time of entering into the agreement is untenable. (*Marie* v. *Garrison*, 83 N. Y. 14.) Where a party obtains what he contracts for, he cannot avoid his contract on the ground that what he received was valueless. (*Fay's Admrs.* v. *Richards*, 21 Wend. 626.)

HAIGHT, J. This action was brought to restrain the defendant from prosecuting certain actions against the plaintiff upon certain promissory notes, and for a decree adjudging that the defendant holds certain bonds as collateral security only for the payment of such notes. The defendant's answer set up by way of counterclaim that under a contract dated August 18, 1891, between the parties, he was entitled to have certain additional bonds deposited with him as collateral security, to be held by him pursuant to the provisions of the contract.

Upon the trial the plaintiff offered no evidence and requested that his complaint should be dismissed. The defendant objected and gave evidence to sustain his claim for an affirmative judgment. The trial court found against the defendant upon the merits and ordered a dismissal of the complaint. The General Term reversed the judgment holding that the defendant was entitled to a specific performance of the contract, which is as follows:

"THIS AGREEMENT, made on the 18th day of August, 1891, between Edward S. Stokes and W. E. D. Stokes, witnesseth:

"*Whereas*, the said W. E. D. Stokes has heretofore, with the consent of said Edward S. Stokes, purchased from Cassius H. Read 1,250 shares of his preferred stock and 500 shares of his common stock of 'The Hoffman House,' a corporation, and with the knowledge and consent of said Edward S. Stokes *is about to purchase* from said Read the remainder of his stock, to wit: 1,963 shares of common stock, *or a portion thereof*, with the intent that they may together be the owners of the *whole* of the stock of said corporation.

"*Whereas*, the whole of the issue of five hundred thousand

of bonds of said 'Hoffman House,' secured by a mortgage to The Farmers' Loan and Trust Company — except twenty-five thousand dollars given up and canceled — are now held and owned by said Edward S. Stokes, except a portion held and controlled by him as a pledge from said Read for money due by him to said Edward S. Stokes.

" *Whereas,* the said Edward S. Stokes hereby declares that the indebtedness of the old firm of C. H. Read & Co. has been paid and extinguished, except the contested claim now in suit against them by John W. Mackay, except the claim against them by Edward S. Stokes, and except about fifteen thousand dollars for taxes which said C. H. Read & Co. are bound to pay; and further declares that there is no indebtedness of the 'Hoffman House,' except as shown in their balance sheet of 31st of July, 1891, for $66,353.49 for current expenses,

" Now, therefore, in consideration of the premises, and of the covenants herein by each made to the other, and for a good and valuable consideration by each paid to the other, the said parties hereby covenant and agree as follows:

" *First.* Neither of said parties will sell any of his stock of the Hoffman House, without first consulting with and offering to sell the same to the other, and if a sale is made by one, the other party shall have the option to make it a sale for joint account.

" *Secondly.* Said Edward S. Stokes shall have, for his services as an officer of said corporation, a salary not to exceed four hundred dollars a month. No new enterprise or business shall be undertaken or any liability incurred by said corporation outside the regular business of managing the present hotel, restaurant and cafés, except with the express consent in writing of said W. E. D. Stokes.

" *Thirdly.* The said W. E. D. Stokes shall have two of the directorships of said corporation for himself or his nominees.

" *Fourthly.* For the consideration aforesaid, the said Edward S. Stokes guarantees the said W. E. D. Stokes that there are no other claims and debts against the 'Hoffman House,'

except those shown on said balance sheet of 31st of July, 1891, and the current expenses, and guarantees and indemnifies him against all claims against the Hoffman House, by said C. H. Read & Co. or John W. Mackay or said Edward S. Stokes, or any other persons as the creditors of said C. H. Read & Co.

" *Fifthly*. The said Edward S. Stokes further covenants and agrees not to sell or dispose of any of the bonds of ' The Hoffman House,' owned or held by him as aforesaid, without the express consent of said W. E. D. Stokes, and also that the $25,000 of the $50,000 of bonds received from said Read, not yet canceled, shall be canceled pursuant to the terms of the mortgage on 1st of July, 1892, and meantime held solely for that purpose, and no interest shall be paid thereon.

" *Sixthly*. And as security for *these guarantees*, for a loan of about $32,000, and for any obligation of said Edward S. Stokes to W. E. D. Stokes, connected with said Read, and against any foreclosure of the said mortgage, said Edward S. Stokes has deposited with said W. E. D. Stokes, bonds of said Hoffman House to the par value of $150,000.

" *Seventhly*. The said W. E. D. Stokes *agrees* to sell and transfer to said Edward S. Stokes one-half of the whole or of *such portions* of said 1,963 shares of common stock as he *may* purchase from said Read, at the price he pays for said shares, with interest at six per cent, on his note at twelve months, with one renewal, if he desires, for twelve months longer, with the stock so held as collateral. Upon payment of said price, at the time above specified, the shares sold be delivered to said Edward S. Stokes, and he shall in the meantime receive the dividends thereon.

" *Eighthly*. For any violation of this agreement each party shall have a claim and charge against the other, on the books and accounts of the Hoffman House.

" In witness whereof, we have hereto set our hands and seals on the day above written.

" E. S. STOKES.
" W. E. D. STOKES."

In entering upon a consideration of the contract a complete understanding of the existing relations of the parties will be useful. The "Hoffman House" is a corporation organized under the laws of New Jersey with a share capital of $750,000, divided into 2,500 shares of preferred stock and 5,000 shares of common stock, which had been divided between the plaintiff and one Cassius H. Read, who had previously thereto been engaged as co-partners in running the "Hoffman House" as a hotel in the city of New York. The property and franchises of the corporation had been mortgaged to secure the payment of $500,000 bonds of the company, which were all owned by the plaintiff, with the exception of a few which were owned by Read, but which were held by the plaintiff as collateral security for Read's indebtedness to him.

On the 1st day of May, 1891, the plaintiff borrowed from the defendant the sum of $32,300 upon his three promissory notes, one for $12,300, and two for $10,000 each, and upon the 14th day of August thereafter the further sum of $4,000, altogether making the sum of $36,300, upon which notes $32,000 and upwards remained unpaid. As collateral the plaintiff had delivered to defendant $30,000 of "United Line" bonds and $125,000 of "Hoffman House" bonds. The defendant had purchased from Read his preferred stock in the "Hoffman House" corporation, 1,250 shares, and 500 shares of his common stock, and held in his hands as collateral security for the payment of Read's indebtedness to him the remaining 1,963 shares owned by Read. Under these conditions the contract was executed. It recites, "for a good and valuable consideration by each paid to the other, the said parties hereby covenant and agree as follows : " Then are inserted provisions in which the parties agree not to sell their stock without first consulting each other; that Edward shall have for his services in conducting the business of the corporation not to exceed $400 per month ; that he shall not engage in any other business; that defendant shall have the naming of two of the directors of the corporation, and certain guarantees are

90

made by the plaintiff with reference to the existing indebtedness and liabilities of the corporation, none of which here require consideration.

We then have a recital appearing in the beginning of the contract to the effect that the defendant " is about to purchase from said Read the remainder of his stock, to wit, 1,963 shares of common stock or a portion thereof, with the intent that they may together be the owners of the whole stock of said corporation." By the sixth clause it is provided : " And as security for these guarantees, for a loan of about $32,000, and for any obligation of said Edward S. Stokes to W. E. D. Stokes connected with said Read, and against any foreclosure of said mortgage, said Edward S. Stokes has deposited with the said W. E. D. Stokes, bonds of said ' Hoffman House ' to the par value of $150,000." And seventh : " The said W. E. D. Stokes agrees to transfer and sell to said Edward S. Stokes one-half of the whole or of such portions of said 1,963 shares of common stock as he may purchase from said Read, at the price he pays for said shares, with interest at six per cent, on his note at twelve months, with one renewal, if he desires, for twelve months longer, with the stock so held as collateral. Upon payment of said price, at the time above specified the shares sold be delivered to said Edward S. Stokes, and he shall in the meantime receive the dividends thereon."

In the sixth clause $150,000 of the " Hoffman House " bonds are mentioned as having been deposited by the plaintiff with the defendant. In fact only $125,000 of such bonds had been deposited, and it was understood by this provision that an additional $25,000 of such bonds should be deposited with the defendant. It is for the specific performance of this part of the contract that the defendant now demands judgment.

It will be observed that the defendant has not agreed to purchase any of the Read stock and that the only provisions of the agreement binding upon him are those pertaining to his sale of stock without first consulting the plaintiff, and that in which he undertakes to sell to the plaintiff one-half of the stock that he purchases from Read. And aside from the

recital in the contract of a good and valuable consideration by
each paid to the other and the provisions alluded to, there is
no consideration passing from the defendant to the plaintiff.
What then was the purpose and intent of the parties?

Edward was the owner of the bonds and a half owner of
the stock of the "Hoffman House" corporation. The
defendant was the owner of half of the preferred stock and
500 shares of the common stock. The property of the cor-
poration consisted of the "Hoffman House," a hotel in the
city of New York. Read had been a co-partner with Edward,
and was still the owner of a large block of the stock. It is
evident that Edward and William contemplated the buying
out of Read and of their running the business of the corpora-
tion themselves. Hence the recital of the contemplated pur-
chase by the defendant of Read's stock.

Obscurity is cast upon the intention of the parties by the
use of the phrase " or a portion thereof," from which it is
alleged that there was no understanding that the defendant
should purchase the whole of the stock; but there follows the
expression, "with the intent that they may together be the
owners of the whole of the stock of said corporation." We
here have an express statement as to the intent of the parties,
and whilst the words "or a portion thereof" may properly
be construed as words of limitation, still when used in con-
nection with that which follows, expressing intent, we think
that the parties must have contemplated the purchase of
the whole or a substantial part thereof. This view, we
think, is strengthened by the fact that the 1,963 shares
did not constitute the whole, for there were still 37
shares outstanding and unaccounted for, so that in
case of the purchase of the entire 1,963 shares they still
would not be absolutely the owners of the *whole*, but
would be substantially so. If this was the true under-
standing of the parties, then the provisions of the seventh
clause require no explanation. The defendant agreed to sell
to the plaintiff one-half of the stock that he should so pur-
chase and take his notes therefor, payable in one year, with

the right to a renewal for another year. Here we have the defendant about to assume further obligations and to give further credit to the plaintiff, and it is apparent that this contemplated action formed the real consideration for the agreement to deposit with the defendant as collateral security the additional $25,000 in bonds of the "Hoffman House" corporation.

The trial court found as facts that the defendant purchased of Read 500 shares of stock for the sum of $10,000 after the contract was executed; that Read refused to sell the rest and that the defendant has not been able to purchase more, and that no part of the 500 shares so purchased has been transferred to the plaintiff.

Ought specific performance under the circumstances be now decreed? We think not. The liability of the plaintiff to the defendant has not been increased. The defendant, through the refusal of Read to sell, has not been able to carry out the understanding of the parties, which formed the real consideration for the deposit with him of the additional collateral.

A contract must possess certain elements in order that a court of equity may exercise jurisdiction to compel its performance. "It must be upon a valuable consideration. It must be reasonably certain as to its subject-matter, its stipulations, its purposes, its parties, and the circumstances under which it was made. It must be, in general, mutual in its obligations and its remedy." (3 Pomeroy's Eq. Jur., sec. 1405.)

The reversal of the judgment by the General Term appears to have been based upon a misconception of the facts. In the opinion it is stated that the pledge of the bonds was in consideration of the loan of about $32,000. The fact that the loan was pre-existing evidently had been overlooked.

The order of the General Term should be reversed and the judgment of the Special Term affirmed, with costs, in this court and the General Term, to the appellant.

BARTLETT, J. (dissenting). I cannot agree with the construction placed upon this contract by the majority of the court.

We are now dealing with the defendant's counterclaim, and the plaintiff is in the position of a defendant. It is well to recall the situation of the parties before we enter upon the construction of this contract.

It is stated in the brief of plaintiff's counsel that at the time of the contract a serious quarrel existed between Read and the plaintiff, Edward S. Stokes. Whether this was so or not it is quite apparent that the plaintiff and the defendant contemplated a joint venture in the corporation known as the "Hoffman House."

Prior to the execution of the contract the plaintiff owed defendant $34,300, represented by four notes, and among other collateral defendant held $125,000 of the "Hoffman House" bonds deposited with him by plaintiff.

Read also owed defendant $25,000, represented by two notes, which were indorsed or guaranteed by plaintiff.

Read had deposited with defendant 1,963 shares of Hoffman House stock as collateral. Thus it appears that, before the execution of the contract, plaintiff was obligated to pay defendant absolutely or conditionally $59,300.

It was under these circumstances that defendant was to purchase, if possible, the 1,963 shares of Hoffman House stock owned by Read, which would require an expenditure, if the stock could be obtained, of nearly $40,000, thus swelling defendant's loans and investments to an aggregate of nearly $100,000.

In the light of these facts, the construction of the contract is not difficult.

I shall refer only to the points about which there is a difference of opinion.

The first and most important point in the contract is its sixth subdivision, which reads as follows, viz. :

" And as a security for these guarantees, for a loan of about $32,000, and for any obligation of said Edward S. Stokes to W. E. D. Stokes connected with said Read, and against any foreclosure of said mortgage, said Edward S. Stokes *has deposited* with said W. E. D. Stokes bonds of said Hoffman House to the par value of $150,000."

It is admitted that the sum here stated of $32,000 should be $34,300, the amount of plaintiff's notes held by defendant.

This clause of the contract follows several others wherein plaintiff has covenanted to do certain things and is declaratory of the new situation.

It will be observed that the collateral in the defendant's hands has been increased from $125,000 to $150,000 of Hoffman House bonds; the contract specifically declares that this increased collateral " has been " deposited. It will also be observed that the collateral is held to secure additional obligations. The $125,000 in Hoffman House bonds was held prior to the contract to secure only plaintiff's indebtedness to defendant of $34,300, but the $150,000 in bonds is held to to secure the guarantees of plaintiff under the contract, the loan made plaintiff by defendant, any obligations of plaintiff to defendant with Read and against any foreclosure of the Hoffman House mortgage.

The declaration in the contract that the new collateral has been delivered is of paramount importance in this case.

It was within the contemplation of the parties, by the very letter of the contract, that the additional $25,000 of Hoffman House bonds should be delivered by plaintiff to defendant contemporaneously with the execution of the contract.

At the trial the defendant testified that plaintiff stated at the interview when the contract was signed: " Sign it as if you had received the $150,000 worth of bonds; the other $25,000 of bonds are down stairs in the safe, and I will give them to you."

The defendant then swears they went down stairs, the bonds were not there and plaintiff said that he had forgotten that he had deposited them in the Safe Deposit Company.

The plaintiff was afterwards upon the stand and did not contradict this testimony.

Defendant also swore that he never received the additional twenty-five thousand dollars of bonds, although he repeatedly demanded them of plaintiff by letter and otherwise.

The importance of all this will be apparent presently.

In the seventh subdivision of the contract defendant agrees

to sell and transfer to plaintiff one-half of the whole or of such portion of said 1,963 shares of common stock as he may purchase from Read at the price he pays and interest, taking his note at twelve months, with a privilege for one renewal for a like term.

In the introductory recitations of the contract it is stated that defendant is about to purchase from Read the remainder of his stock, to wit: 1,963 shares of common stock, or a portion thereof, with the intent that they may together be the owners of the whole of the stock of said corporation.

It will be observed that in the above clause and also in the seventh subdivision of the contract the defendant is referred to as purchasing the whole of this stock or a portion thereof.

The sequel proved that Read was not willing to part with the entire amount of his stock and although defendant repeatedly applied to him he only succeeded in purchasing five hundred shares.

It is now contended by plaintiff when defendant seeks to enforce the contract, that the principal object of the agreement was to secu.e all of Read's stock and that defendant having failed to secure all of it he is in default and cannot compel the delivery to him of the additional $25,000 of bonds and that the contract is abandoned.

It has already been pointed out that this $25,000 in bonds should have been delivered at the time the contract was executed and that their delivery was in no manner conditioned upon defendant's subsequent performance of the contract.

It remains to be considered whether the principal object of the contract was to secure all of Read's stock. It was no doubt the intent and desire of both parties to secure Read's entire stock if possible, but it was clearly recognized by them that the consummation of this result was doubtful and so both in the recitation and seventh subdivision of the contract defendant is to purchase all of the stock or a portion thereof. The defendant insists he has carried out his contract to the letter by purchasing such stock as Read would sell and that the words in the contract indicating the possibility of securing less than the whole of the stock were inserted to protect him,

as it was not known whether Read could be induced to part with all of his stock.

On the other hand, the plaintiff, who is bound to give force and effect to these qualifying words, says that they were inserted to cover the possible event of plaintiff buying a portion of the stock.

This suggestion has no foundation in the contract or in the situation of the parties.

The seventh subdivision shows that plaintiff was not obligated to buy a share of the stock even if defendant had succeeded in purchasing all of it; he is vested with a mere option to take such stock as he chose, giving for it his note at a year with privilege of a renewal for a like period.

This shows very clearly that plaintiff was looking to the defendant to furnish the capital to carry out the purchase of the stock, and it also shows that defendant realizing that he might be tying up $40,000 for two years if he should succeed in getting all of Read's stock and was taking the risk of a new investment, demanded before the contract was drawn that he should have additional collateral for the purpose already pointed out.

When this position of the parties is considered I think the principal object of the contract was to secure all of the outstanding stock that could be obtained and that both plaintiff and defendant realized that the relations existing between plaintiff and Read rendered the acquisition of the whole of the latter's stock very doubtful.

I think there was abundant consideration for this contract; that it has not been abandoned, but is in full force and effect, and that defendant is entitled to receive from plaintiff as collateral security the additional $25,000 in Hoffman House bonds.

The order below should be affirmed, and judgment absolute ordered for the defendant, with costs in all courts.

ANDREWS, Ch. J., GRAY and MARTIN, JJ., concur with HAIGHT, J., for reversal.

O'BRIEN and VANN, JJ., concur with BARTLETT, J., for affirmance.

Order reversed.