WILLIAM E. D. STOKES, Appellant, *v.* ELIZUR V. FOOTE, as Executor of EDWARD S. STOKES, Deceased, Respondent.

1. CONTRACT — CONSIDERATION — CONDITION PRECEDENT. A provision in an agreement made by a creditor with a debtor, who had deposited with him corporate bonds as collateral security, to purchase shares of corporate stock held by a third person or a portion thereof and to sell one half of the whole or of such portion to the debtor, is not the sole consideration of an entire agreement so that failure to purchase all of such third person's stock will render the agreement unenforceable, where it contains independent covenants on the part of the creditor whereby he surrenders his absolute right to dispose of his stock and agrees to sell it to the debtor on credit or to dispose of it on joint account at the latter's option; nor is it a condition precedent to the creditor's right to hold the bonds in his possession for the purposes mentioned in the agreement.

2. JUDGMENT — CONCLUSIVENESS. The provisions of a decree concerning a question not necessarily involved in the issues or presented to the court are not final and conclusive upon the parties.

3. TRIAL — RES JUDICATA. An issue finally determined in a former suit between the parties need not be submitted to the jury.

4. CONSTRUCTION OF CONTRACT — QUESTION OF LAW. The question whether the failure of a party to a contract to purchase all the shares of stock owned by another amounts to a breach of the contract calls for its construction and is a pure question of law.

5. QUESTION FOR JURY — IMMATERIALITY. An immaterial question need not be submitted to the jury.

*Stokes* v. *Stokes*, 49 App. Div. 302, reversed.

(Argued October 20, 1902; decided November 11, 1902.)

APPEAL from an order of the Appellate Division of the Supreme Court in the first judicial department, entered March 23, 1900, sustaining defendant's exceptions ordered to

be heard in the first instance by the Appellate Division and granting a motion for a new trial.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Benjamin F. Tracy* for appellant. The present verdict was properly directed unless the evidence would have justified the jury in finding that the bonds referred to were held as collateral security for the payment of the notes and for no other purpose. (*Woodgate* v. *Fleet*, 44 N. Y. 1; *Stannard* v. *Hubbell*, 123 N. Y. 520; *House* v. *Lockwood*, 137 N. Y. 259; Bigelow on Estop. 152; *Reynolds* v. *Stockton*, 140 U. S. 254; *Jackson* v. *Wood*, 3 Wend. 37; *Jackson* v. *Wood*, 8 Wend. 10; *Sweet* v. *Tuttle*, 14 N. Y. 465; *Campbell* v. *Consalus*, 25 N. Y. 613; *People ex rel.* v. *Johnson*, 38 N. Y. 63; *Hymes* v. *Estey*, 116 N. Y. 501; *Lorillard* v. *Clyde*, 122 N. Y. 41.) The failure of the plaintiff to purchase all of Read's 1,963 shares of stock constituted no breach of contract of August eighteenth, either total or partial. (*Burr* v. *A. S. S. Co.*, 17 Hun, 188; *People* v. *Lee*, 104 N. Y. 441.)

*John G. Milburn* and *Charles E. Hughes* for respondent. As a verdict was directed for the plaintiff all contested facts must be treated as established in the defendant's favor. (*Stone* v. *Flower*, 47 N. Y. 566; *Trustees* v. *Kirk*, 68 N. Y. 459; *F. Nat. Bank* v. *Dana*, 79 N. Y. 108; *Train* v. *Holland Co.*, 62 N. Y. 598; *Ormes* v. *Dauchy*, 82 N. Y. 444; *Higgins* v. *Eagleton*, 155 N. Y. 466; *Bank* v. *Weston*, 159 N. Y. 201.) The defendant made a valid tender of the amount due upon the four notes in suit, and unless the plaintiff was entitled to retain the Hoffman House bonds for some purpose other than to secure these notes, the counterclaim was established. (*Cass* v. *Higenbotam*, 100 N. Y. 248; *Wheelock* v. *Tanner*, 39 N. Y. 481; *H. Ins. Co.* v. *P. Ins. Co.*, 118 N. Y. 165; *Bailey* v. *County of Buchanan*, 115 N. Y. 297; *Kortwright* v. *Cady*, 21 N. Y. 343; *E. F. Ins. Co.* v. *Norris*, 74 Hun, 527.) Independently of the agreement of August 18,

1891, there never was any pledge or agreement under which the plaintiff was entitled to hold the Hoffman House bonds for any purpose other than to secure the four notes in suit. (*Forbes* v. *Jackson,* L. R. [19 Ch. Div.] 615; *Ellsworth* v. *Lockwood,* 42 N. Y. 98; Baylies on Sureties, 364–370; *Baker* v. *Thrasher,* 4 Den. 493; *Eckford* v. *De Kay,* 26 Wend. 29; *McCauley* v. *Porter,* 71 N. Y. 173; *Randall* v. *Sanders,* 87 N.Y. 578; *Pond* v. *Harwood,* 139 N.Y. 111; *Stokes* v. *Stokes,* 23 App. Div. 423; *Marsh* v. *McNair,* 99 N. Y. 174; *Thomas* v. *Scutt,* 127 N. Y. 133; *Morgenstern* v. *Davis,* 37 N. Y. S. R. 819; *Engelhorn* v. *Reitlinger,* 122 N. Y. 76; *House* v. *Walch,* 144 N. Y. 418.) The judgment in the equity suit was a conclusive adjudication that W. E. D. Stokes had failed to perform the consideration of the agreement of August 18, 1891, and that for this reason it could not be enforced against E. S. Stokes. (1 Freeman on Judg. [4th ed.] § 248; *Smith* v. *Kernocken,* 7 How. [U. S.] 198; *Strang* v. *Moog,* 72 Ala. 460; *People's Bank* v. *Eherts,* 96 Mich. 396; *Williamsburgh Bank* v. *Town of Solon,* 136 N. Y. 465; *Blackinton* v. *Blackinton,* 113 Mass. 231; *Parnell* v. *Hahn,* 61 Cal. 131; *Dunham* v. *Bower,* 77 N. Y. 76; *Gates* v. *Preston,* 41 N. Y. 113; *Blair* v. *Bartlett,* 75 N. Y. 150; *Gardiner* v. *Buckbee,* 3 Cow. 120.) If the judgment in the equity suit could be treated as leaving open the question of the performance by W. E. D. Stokes of the consideration of the August agreement, the evidence received upon the trial was sufficient to show that it had not been performed, and it was error to direct a verdict for the plaintiff. (*Kenyon* v. *K. T. & M. M. A. Assn.,* 122 N. Y. 247; *Trustees of Easthampton* v. *Vail,* 151 N. Y. 463; *F. Nat. Bank* v. *Dana,* 79 N. Y. 108; *White* v. *Hoyt,* 73 N. Y. 505; *Etting* v. *Bank,* 11 Wheat. 59.)

BARTLETT, J. The defendant, Edward S. Stokes, and one Cassius H. Read, prior to the year 1891, were equal owners of $750,000, par value, of the stock issued by the hotel corporation known as "The Hoffman House" in the city of New

York, which was divided into 2,500 shares of preferred stock and 5,000 shares of common stock. There was also issued $500,000 in bonds, secured by mortgage on the corporate property, which were nearly all owned by the defendant, Edward S. Stokes, a few being held by Read.

During the year 1890 differences arose between Edward S. Stokes and Read which led to negotiations being opened between the former and his cousin, William E. D. Stokes, the plaintiff, looking to an arrangement which would result in the retirement of Read and the substitution of William in the corporate business.

During these early negotiations William loaned large sums of money to Edward and to Read, to secure which he held collateral security, and as a result of further discussion between the parties their respective rights were fixed by an agreement in writing, dated August 18th, 1891, of which the following is a copy :

"This agreement made the 18th day of August, 1891, between Edward S. Stokes and W. E. D. Stokes, witnesseth :

"Whereas, the said W. E. D. Stokes has heretofore, with the consent of the said Edward S. Stokes, purchased from Cassius H. Read 1,250 shares of his preferred stock and 500 shares of his common stock of the 'Hoffman House,' a corporation, and with the knowledge and consent of the said Edward S. Stokes is about to purchase from said Read the remainder of his stock, to wit, 1,963 shares of common stock, or a portion thereof, with the intent that they may together be the owners of the whole of the stock of said corporation ;

"Whereas, the whole of the issue of the $500,000 of bonds of said 'Hoffman House' secured by a mortgage to the Farmers' Loan & Trust Company — except $25,000 given up and canceled — are now owned and held by said Edward S. Stokes, except a portion held and controlled by him as a pledge from said Read, for money due by him to said Edward S. Stokes ;

"Whereas, said Edward S. Stokes hereby declares that the indebtedness of the old firm of C. H. Read & Co. has been paid and extinguished, except the contested claim now in suit

against them by John W. Mackey, except the claim against them by Edward S. Stokes, and except about $15,000 for taxes which said C. H. Read & Co. are bound to pay; and further declares that there is no indebtedness of the 'Hoffman House' except as shown in their balance sheet of 31st July, 1891, for $66,353.49 and for current expenses.

"Now, therefore, in consideration of the premises, and of the covenants herein by each made to the other, and for a good and valuable consideration by each paid to the other, the said parties hereby covenant and agree as follows:

"*First.* Neither of said parties will sell any of his stock of the 'Hoffman House' without first consulting with and offering to sell the same to the other, and if a sale is made by one, the other party shall have the option to make it a sale for joint account.

"*Secondly.* Said Edward S. Stokes shall have, for his services as an officer of said corporation, a salary not to exceed four hundred dollars a month. No new enterprises or business shall be undertaken or any liability incurred by said corporation outside of the regular business of managing the present hotel, restaurants and cafes, except with the express consent in writing of said W. E. D. Stokes.

"*Thirdly.* The said W. E. D. Stokes shall have two of the directorships of said corporation for himself or his nominees.

"*Fourthly.* For the consideration aforesaid, the said Edward S. Stokes guarantees the said W. E. D. Stokes that there are no other claims and debts against the 'Hoffman House' except those shown on said balance sheet of 31st of July, 1891, and the current expenses and guarantees and indemnifies him against all claims against the 'Hoffman House' by said C. H. Read & Co., or John W. Mackey, or said Edward S. Stokes, or any other persons as the creditors of said C. H. Read & Co.

"*Fifthly.* The said Edward S. Stokes further covenants and agrees not to sell or dispose of any of the bonds of the 'Hoffman House,' owned or held by him as aforesaid, without the express consent of said W. E. D. Stokes, and also that the

$25,000 of the $50,000 of bonds received from said Read, not yet canceled, shall be canceled pursuant to the terms of the mortgage on 1st of July, 1892, and meantime held solely for that purpose, and no interest shall be paid thereon.

" *Sixthly.* And as security for these guarantees, for a loan of about $32,000, and for any obligation of said Edward S. Stokes to W. E. D. Stokes, connected with said Read, and against any foreclosure of the said mortgage, said Edward S. Stokes has deposited with said W. E. D. Stokes bonds of said 'Hoffman House' to the par value of $150,000.

" *Seventhly.* The said W. E. D. Stokes agrees to sell and transfer to said Edward S. Stokes one-half of the whole, or of such portion of said 1,963 shares of common stock as he may purchase from said Read, at the price he pays for said shares, with interest at six per cent on his note at twelve months, with one renewal if he desires, for twelve months longer, with the stock so sold as collateral. Upon payment of said price, at the time above specified, the shares sold shall be delivered to said Edward S. Stokes, and he shall, in the meantime, receive the dividends thereon.

" *Eighthly.* For any violation of this agreement each party shall have a claim and charge against the other on the books and accounts of the Hoffman House.

" In witness whereof, we have hereto set our hands and seals the day above written.

" E. S. STOKES        [SEAL],
" W. E. D. STOKES        [SEAL]."

Prior to the execution of this agreement, and on the 1st day of May, 1891, Edward, the defendant, borrowed from William, the plaintiff, the sum of $32,300 on three promissory notes, and upon the 14th day of August following the further sum of $4,000, for which a fourth note was given, making a total of $36,300. As collateral security Edward delivered to William 30 United Lines Telegraph bonds and 125 Hoffman House bonds. William had also purchased all of Read's preferred stock in the Hoffman House corporation, 1,250 shares, and 500 shares of his common stock.

Read at this time owed William $25,000, represented by two notes, one for $10,000, indorsed by Edward, the other for $15,000, guaranteed by Edward. Read had deposited with William as collateral security for this indebtedness 1,963 shares of the common stock of the Hoffman House corporation, being all the common stock he then owned. The loan represented by the four notes was reduced to about $32,000.

This was the situation at the time the agreement of August 18th, 1891, was executed.

In the year 1892 disagreements arose between Edward and William, which culminated on October 12th, 1892, when William began two actions in the Superior Court of the city of New York against Edward, one on three of the notes and the other on the fourth note, already mentioned. These actions were consolidated and that action is the one before the court.

Immediately after this action was begun, Edward brought a suit in equity in the Supreme Court against William to enjoin its prosecution on the ground that the collateral in William's hands was held only as security for the four notes and that the agreement of August 18th, 1891, had been abandoned.

A preliminary injunction was issued in the equity suit, but was vacated on the motion to continue it, the court holding that the action would not lie, as Edward's remedy at law was adequate.

Edward thereupon served his answer in this action in which he admitted giving the notes and that they were due and unpaid and pleaded a tender of payment of the notes, interest and costs on the condition that William surrender the notes and the collateral security held by him, which tender was refused.

Edward then set up by way of counterclaim the giving of the four notes in suit, alleged that the collateral in William's hands was held only as security for their payment, repeated the allegations of tender, demand and refusal, and alleged that William converted the collateral security to his own use

and demanded judgment for its value after deducting amount due on notes, with interest.

William served a reply denying that the collateral was held only as security for the payment of the notes; also denying the value of the bonds, and alleged they had no market value. The reply admitted that 30 United Lines Telegraph bonds were held as collateral security only for the payment of the notes.

(It may be remarked here that on the last trial of this action it was stipulated, in open court, that no question is made as to the United Lines bonds.)

The reply then set up the agreement of August 18th, 1891, which stated that Edward *had* deposited $150,000 in Hoffman House bonds, but that in fact he had only deposited $125,000 of said bonds, no more and none other, and that they were still held by William. The reply further alleged that Edward had neglected and refused to make the deposit of the additional bonds under said agreement to the injury and damage of plaintiff. There was also a denial of the alleged conversion of the collateral security.

This case has been twice tried and resulted each time in a directed verdict for the plaintiff. The judgment entered at the first trial was affirmed by the General Term of the Superior Court and in this court. (155 N. Y. 581.) A motion for a new trial was subsequently granted by the court below on the ground of newly-discovered evidence. The second trial resulted in a directed verdict for the plaintiff and the defendant's exceptions were ordered to be heard at the Appellate Division in the first instance. The Appellate Division sustained the defendant's exceptions and ordered a new trial. From this order the plaintiff, William E. D. Stokes, has appealed to this court, stipulating for judgment absolute in case of affirmance.

It now becomes necessary to consider more in detail the history of this action and the equity suit to which reference has been made.

When this case was before us on the first appeal it was

held that the trial court properly directed the verdict in favor of the plaintiff, as the defendant had failed to establish his counterclaim by proving that the bonds were held by the plaintiff as collateral security for the payment of the notes and for no other purpose. This decision was rendered by a divided court, Judges HAIGHT and MARTIN delivering the prevailing opinions, and Chief Judge PARKER and Judge GRAY writing dissenting opinions.

The equity suit, although begun after the institution of this action, was first tried. William, as defendant in the equity suit, answered and set up a counterclaim, to which Edward replied. The issues raised by the counterclaim and reply alone were tried, and resulted in a judgment dismissing the complaint and counterclaim, the latter on the merits, both without costs; also adjudging that plaintiff was not entitled to an injunction; also that defendant not having purchased all of Read's common stock of the Hoffman House corporation, 1,963 shares, could not enforce agreement of August 18th, 1891. The General Term reversed this judgment, but on appeal this court reversed the General Term and affirmed the judgment of the Special Term, on a vote of four to three (148 N. Y. 708).

As one of the important questions on this appeal is the scope and effect of this judgment, it will be necessary to determine the precise issues raised by the pleadings in the equity suit.

In the action now before us the judgment in the equity suit is not set up in the answer as a bar, nor is it referred to in any way.

The record in the case at bar shows that the counsel for plaintiff introduced in evidence the judgment roll in the equity suit.

The defendant and respondent seeks to maintain the following propositions on this appeal: (1) That the contract of August 18th, 1891, was entire, and the purchase of all of Read's 1,963 shares of stock by the plaintiff was a condition precedent to his right to hold the 125 bonds then in his pos-

session for any of the purposes mentioned in that contract. (2) That the judgment in the equity suit concludes the plaintiff upon all the issues in the present action. (3) That the direction of a verdict was, in any aspect of the case, error, as there were questions which should have been submitted to the jury.

*First,* as to the construction of the agreement of August 18th, 1891.

It starts out with certain recitations, which, taken in connection with the agreement, are of controlling importance. The first declares that William, with the consent of Edward, had purchased from Read 1,250 shares of his preferred stock and 500 shares of his common stock of the Hoffman House corporation, and with the knowledge and consent of Edward, William was " about to purchase from said Read the remainder of his stock, to-wit : 1,963 shares of common stock, *or a portion thereof,* with the intent that they may together be the owners of the whole of the stock of said corporation."

This recitation being read in connection with the subdivision of the agreement marked " Seventhly," leaves no room for two constructions. That subdivision is as follows : " The said W. E. D. Stokes agrees to sell and transfer to said Edward S. Stokes one-half of the whole, *or of such portion* of said 1,963 shares of common stock as he *may* purchase from said Read, at the price he pays for said shares, with interest at six per cent on his note at twelve months, with one renewal if he desires for twelve months longer, with the stock so sold as collateral. Upon payment of said price, at the time above specified, the shares sold shall be delivered to said Edward S. Stokes, and he shall, in the meantime, receive the dividends thereon."

The counsel for Edward throughout these litigations have insisted that this agreement obligated William to purchase all of the 1,963 shares of common stock owned by Read, and failing in that, this agreement being entire, there was an absolute failure of consideration, rendering it unenforceable.

It was clearly in the minds of the parties that William

might be able to purchase only a portion of Read's stock. It is true that Edward and William desired, if possible, to become the owners of the entire stock of the corporation, but owning between them, as they did, all of the preferred stock and a large majority of the common stock, there was not the slightest difficulty in operating this agreement, if, for any reason, William failed to acquire all of the stock held by Read.

In order to give some force and effect to the provision in the recitation that William was to purchase this stock, "*or a portion thereof*," and the further words in the seventh subdivision of the agreement following William's agreement to sell and transfer to Edward "*one-half of the whole, or such portion of said 1,963 shares of common stock as he may purchase from said Read*," it has been suggested that these words were inserted in order to exclude from William's obligation to buy such portion of the stock as Edward might purchase. It is sufficient to say that this construction is not justified either by the language of the agreement or the surrounding circumstances. If anything is clearly disclosed in the litigations to which this agreement has given rise, it is that Edward was indebted to William at the time of its execution and in need of financial assistance.

The seventh provision of the contract provides that whether William purchased the whole or a portion of Read's stock, he was to sell one-half of the amount so acquired to Edward on his note at twelve months, with a renewal for a like term if desired. This provision excludes any inference, from the general situation of the parties, that it was within their contemplation that Edward was to buy any of the stock of Read. To say that William rests under the positive covenant to purchase all of Read's stock is to make a new contract between the parties.

The next recitation in the agreement deals with the ownership of the $500,000 of bonds, which is not material to this controversy. Then follows the recitation that Edward declares that the indebtedness of the old firm of C. H. Read & Co.

22

had been paid and extinguished, except the contested claim in suit against them by John W. Mackey, except the claim against them by Edward, and except about $15,000 for taxes, which C. H. Read & Co. were bound to pay, and further declared that there was no indebtedness of the Hoffman House corporation except as contained in a certain balance sheet for $66,353.49 and current expenses. Then follow the express covenants in the agreement: (1) Neither of the parties was to sell any of his stock without consulting with and offering to sell it to the other, and, if a sale was made, the other party had the option to make it a sale on joint account; (2) Edward to have a certain salary and no new enterprise or business were to be begun or liability incurred by the corporation outside of its regular business except with the consent of the parties in writing; (3) William was to have two of the directorships of said corporation; (4) Edward guaranteed William that there was no other claims against the Hoffman House corporation except those disclosed in the balance sheet and the current expenses, and guaranteed and indemnified him as to all claims against the Hoffman House corporation or C. H. Read & Co., or John W. Mackey or himself, or any other persons as the creditors of C. H. Read & Co.; (5) Edward further agreed not to sell any of his Hoffman House bonds without the consent of William, and also covenanted to cancel certain bonds deposited with him by Read pursuant to the terms of the mortgage, and no interest was to be paid thereon; (6) and, as security for these guaranties, for a loan of about $32,000, and for any obligation of Edward to William, connected with said Read, and against any foreclosure of said mortgage, Edward "*has* deposited with said W. E. D. Stokes bonds of said Hoffman House to the par value of $150,000;" (7) (this covenant has already been considered in connection with the obligation of William to purchase Read's common stock); (8) in case of a violation of the agreement each party was to have a claim and charge against the other on the books and accounts of the Hoffman House.

It being clear, as we have pointed out, that William did not

covenant absolutely to purchase the entire common stock of Read, it is obvious upon the face of· this agreement that it contains independent covenants to be separately performed and that William's covenant to purchase the stock of Read is not the sole consideration of an entire agreement.

Judge Story says that "An entire contract is a contract, the consideration of which is entire on both sides. The entire fulfillment of the promise by either is a condition precedent to the fulfillment of any part of the promise by the other." (Story on Contracts [4th ed.], § 22.) "In contracts with executory considerations, if the performance or satisfaction of the consideration forms a condition precedent to the liability under the contract, the failure of consideration discharges the liability." (Leake on Contracts, p. 631.)

As already pointed out, William was the owner of 1,250 shares of the preferred stock and 500 shares of the common stock of the Hoffman House corporation previous to the making of the agreement of August 18th, 1891. The agreement discloses in its first subdivision that William had surrendered his absolute power to dispose of his stock and agreed to sell the same to Edward, or make it a sale on joint account at his option.

It has been argued that this is a mere negative covenant. An agreement to shackle the absolute power to dispose of a large amount of personal property and render it subject to option is, of itself, a valuable consideration. Furthermore, the covenant entered into by William to sell to Edward the whole or such portion of the stock as he should purchase from Read on a credit of one or two years, at the option of the latter, also expresses a valuable consideration. It confers upon Edward a long term of credit and ties up the property of William.

It remains to consider the sixth subdivision of the agreement which has an important and controlling effect upon the construction thereof. By the fourth subdivision Edward entered into certain guaranties as to claims against the Hoffman House for William's indemnification, and by the first

and second subdivisions of the agreement he had covenanted
not to sell any of his stock of the Hoffman House corporation
except under certain conditions already referred to, and that
no liability should be incurred by the corporation outside of
its regular business except with the consent, in writing, of
William.

It rests upon undisputed evidence that Edward, prior to
the execution of the agreement of August 18th, 1891, had
deposited with William 125 bonds of the Hoffman House
corporation as collateral security for a certain indebtedness
due from him to William. It also appears that at the time
of the execution of the agreement William still held as collat-
eral these 125 bonds. The legal effect of the agreement was
to treat these bonds as redelivered by Edward to William
under its provisions. It is also undisputed that notwithstand-
ing the agreement states in its sixth subdivision that 150 of
the Hoffman House bonds *had* been deposited with William,
as matter of fact the remaining 25 bonds had not been so
deposited.

At the trial of the equity suit William testified that Edward
stated at the interview when the contract was signed : " Sign
it as if you had received the $150,000 worth of bonds; the
other $25,000 of bonds are downstairs in the safe and I will
give them to you." William also swears they went down-
stairs, the bonds were not there and Edward said that he had
forgotten that he had deposited them in the safe deposit com-
pany and was to get them at once. Edward was afterwards
on the stand and did not contradict this testimony. These 25
bonds were treated as already delivered under the plain read-
ing of the contract at the time of its execution and such
delivery was in no way dependent upon William purchasing
the whole, or any part, of Read's 1,963 shares of common
stock, or performing any other covenant of the agreement.

This instrument, considered upon its face and regarding the
circumstances existing at the time of its execution, makes it
clear that William actually held 125 of the Hoffman House
bonds and was entitled to hold 25 more as collateral to the

guaranties of Edward; to the loan of $32,000; for any obligation of Edward to William connected with Read; and against any foreclosure of the Hoffman House mortgage.

It is undisputed that William did purchase 500 of the 1,963 shares of Read's common stock, after the execution of the agreement of August 18th, 1891, paying therefor some $10,000. Edward swears to the purchase in his complaint and reply in the equity suit.

We thus have part performance by William of an agreement, not entire, but containing independent covenants.

This case has been argued as if William, as a stranger, was to become practically the partner of Edward in business, and that before the agreement of August 18th, 1891, could possess vitality or binding force, William must purchase all of Read's stock. This position is not only unsound for the various reasons already given, but on the additional ground that William did not occupy the attitude of a stranger seeking to gain admittance to a going and profitable business, but rather the position of one who had advanced some $59,300 in aid of a struggling enterprise before the agreement was signed and was, under its provisions, to assume a possible obligation to pay out $40,000 more. In other words, he might ultimately have at risk $100,000 more or less.

*Second*, as to the contention that the judgment in the equity suit concludes the plaintiff on all the issues in this action.

It must be admitted that the judgment in the equity suit adjudges that William was bound to purchase all of Read's 1,963 shares of the common stock of the Hoffman House corporation, and having failed to do so, by reason of Read's refusal to sell, the contract could not be enforced against Edward. It is well settled, however, that " although a decree in express terms purports to affirm a particular fact, or rule of law, yet if such fact or rule of law was immaterial to the issue, and the controversy did not turn upon it, the decree will not conclude the parties thereto." (*Woodgate* v. *Fleet*, 44 N. Y. 1, 13; *Stannard* v. *Hubbell*, 123 N. Y. 520; *House*

v. *Lockwood,* 137 N. Y. 259; *Reynolds* v. *Stockton,* 140 U. S. 254; *Packet Co.* v. *Sickles,* 5 Wall. 592; *Jackson* v. *Wood,* 3 Wend. 37, and *Wood* v. *Jackson,* 8 Wend. 10; *Sweet* v. *Tuttle,* 14 N. Y. 465; *Campbell* v. *Consalus,* 25 N. Y. 613; *People ex rel. Reilly* v. *Johnson,* 38 N. Y. 63; *Hymes* v. *Estey,* 116 N. Y. 501, 509; *Lorillard* v. *Clyde,* 122 N. Y. 41; Bigelow on Estoppel, 152; *Duchess of Kingston's Case,* Everest & Strode, 410.) Lord Chief Justice DeGray said in the case last cited: "That neither the judgment of a concurrent or exclusive jurisdiction is evidence of any matter which came collaterally in question, though within the jurisdiction, or of any matter incidentally cognizable, or of any matter to be inferred by argument from the judgment."

It is, therefore, necessary to determine the precise issues framed by the pleadings and tried in the equity suit. Edward in beginning the suit had mistaken his remedy and was turned over to a court of law. When this case was called for trial Edward moved to dismiss his own complaint, but William insisted on taking the affirmative and trying the issues under his counterclaim and the reply thereto. This right was accorded him by the court and the trial proceeded on these issues.

William set up a counterclaim as follows, repeating all the facts that he had pleaded in detail in his answer: "At all times since the making, execution and delivery of said contract, dated August 18th, 1891, defendant has been and is now entitled to have deposited with him by plaintiff the whole of said bonds of said Hoffman House to the par value of $150,000, to be held by defendant as security pursuant to the terms and provisions of said agreement dated August 18th, 1891. That plaintiff has neglected and refused and still neglects and refuses to make such deposit with defendant of $25,000, in amount, of bonds, although frequently requested to do so; to the wrong, injury and damage of defendant. Wherefore defendant prays judgment against plaintiff as follows: (1) That the complaint be dismissed with costs. (2) That it be adjudged that plaintiff was not, at the commence-

ment of this action, entitled to the temporary injunction granted herein. (3) That plaintiff be required to deliver to and deposit with defendant additional bonds of the Hoffman House to the par value of $25,000, or the value thereof in cash, *to be held by defendant pursuant to the agreement of August 18th, 1891.* (4) That the defendant may have such other or further relief," etc.

Edward served a reply to the counterclaim, in which he denied the allegations thereof, to the effect that defendant was entitled to have deposited with him $150,000 in bonds of the Hoffman House under the agreement of August 18th, 1891. He admitted that he had refused and still refuses to make a further deposit of $25,000 of bonds of the Hoffman House corporation with the defendant, and that he had not made such deposit. He then alleges as follows: " Further replying to said counterclaim the plaintiff alleges that subsequent to the execution and delivery of the said contract the defendant purchased from Cassius H. Read, referred to therein, 500 shares of common stock, part of the 1,963 shares of said stock referred to in paragraph seventhly of said agreement, and that after making such purchase (the plaintiff requested the defendant to purchase the remainder of the stock of said Read which he refused to do) and applied to the plaintiff to be relieved from the further performance of said contract." The reply then sets up in detail the matter of the West Virginia lands and alleges that the parties to the contract of August 18th, 1891, had abandoned the same. The reply then closes as follows: " Further replying to said counterclaim, and for a further and separate defense thereto, the plaintiff alleges that the construction asked by the defendant to be placed upon said contract of August 18th, 1891, is inequitable, and that the terms and conditions thereof are so indefinite, uncertain and oppressive that it would be inequitable to enforce the same." The reply then demands judgment dismissing the counterclaim and granting the relief prayed in the complaint.

The reply of Edward, most favorably construed as to him,

interposes two defenses: (1) That by an agreement made after the contract of August 18th, 1891, the parties thereto covenanted 'that said agreement should be abandoned. (2) That the claim of the defendant that plaintiff be compelled to specifically perform the contract of August 18th, 1891, by depositing the additional 25 Hoffman House bonds was, in view of the circumstances under which the contract was made, inequitable, oppressive and unjust.

As we have already pointed out, the plain reading of the contract that $150,000 of Hoffman House bonds *had* been deposited at the time of its execution, made the remaining 25 bonds deliverable at once on the signing of the contract; but if we assume it was open to the court to consider the effect of William's failure to purchase all of Read's stock, the only question before it was whether, this fact being proved, William was entitled to specific performance. This was merely an appeal to the discretion of the court. The question before the court may be thus stated: Is it equitable to require the plaintiff to deposit with defendant the additional 25 bonds, the latter having failed to acquire all of Read's stock by reason of his refusal to sell, it being immaterial in the present suit whether the failure to purchase was due to inability to perform a positive or conditional contract obligation?

The pleadings in the equity suit did not involve the general consideration of the agreement of August 18th, 1891. The question as to whether it was obligatory upon William to purchase all of Read's stock was not presented to the court, and the fact that the trial judge saw fit to pass upon that point renders the provisions of the decree in that regard mere surplusage and of no binding force or effect.

There is no doubt as to the general rule that a judgment of a court of competent jurisdiction is final and conclusive upon the parties, not only as to the issues actually determined, but as to every other question which the parties might or ought to have litigated. (*Embury* v. *Conner*, 3 N. Y. 511, 522; *White* v. *Coatsworth*, 6 N. Y. 137, 139; *Pray* v. *Hegeman*, 98 N. Y. 351, 358; *Jordan* v. *Van Epps*, 85 N. Y. 427, 437;

*Smith* v. *Smith*, 79 N. Y. 634; *Clemens* v. *Clemens*, 37 N. Y. 74; *Lorillard* v. *Clyde*, 122 N. Y. 41; *Reich* v. *Cochran*, 151 N. Y. 122, 127.) In other words, all the issues that were necessarily involved.

When this case was here before, Judge MARTIN, writing one of the prevailing opinions at that time, said (155 N. Y. 581, 589): "It is apparent that the case of *Stokes* v. *Stokes* (148 N. Y. 708) cannot be given the effect claimed for it by the present appellant, and accorded to it in the opinions which favor a reversal. The only question actually involved in that case was whether, under the circumstances proved, specific performance ought to be decreed. It arose upon the then defendant's counterclaim, by which he sought to compel the plaintiff in that action to specifically perform the contract of August 18th, by depositing $25,000 of bonds, in addition to the $155,000 already deposited with him. It was understood by the parties when they entered into that contract that William could probably purchase from Read his stock which consisted of 1,963 shares. That he was unable to do. He was thus relieved from the investment of a large amount of money which would have been required for the purpose if he had been able to make the contemplated purchase. That the securities which he held were abundantly sufficient to indemnify him against any liability, actual or contingent, which then existed by reason of that contract, was obvious. Under those circumstances this court held that specific performance ought not to be decreed, and that the General Term erred in reversing the judgment of the Special Term, which dismissed both the plaintiff's complaint and the defendant's counterclaim. Obviously, this was upon the ground that the liability of William was less than was originally contemplated, and, hence, did not require the deposit of any additional security to completely indemnify him. Under the circumstances the discretion which rests in a court of equity in determining whether specific performance shall be granted or withheld, plainly authorized the court to refuse the decree sought. The right of specific performance rests in the judicial discretion of the

court, and may be granted or withheld upon a consideration
of all the circumstances and in the exercise of such discretion.
\*   \*   \*   Whether the securities already in the possession of
William might be held by him as security for the liabilities
mentioned in the agreement, was not at all material, or in any
way necessary to the determination of that issue. It was not
a relevant or necessary fact to be decided in that case. The
decision of the court was only to the effect that as William
was abundantly secured against loss by reason of any liability
of Edward, direct or contingent, it would be inequitable to
compel the latter to deposit the additional security provided
for by the contract, and, hence, the court would not accord to
him the peculiar relief of specific performance, but leave the
parties to their legal remedy. Hence it follows that the
question whether William is entitled to hold the bonds in his
possession as collateral security for the performance of the
provisions of the contract is an open one and not controlled
by the decision in that case."

As to the issue in the equity suit, that the contract of
August 18th, 1891, had been abandoned, it is sufficient to say
that the court expressly found as follows: " Since the making,
execution and delivery of said contract, or agreement, the
parties thereto have not agreed to abandon the same, or to
modify it in any respect, and it has not been abandoned."

*Third,* as to the proposition that certain questions should
have been submitted to the jury. The judgment in the
equity suit was entered at the Trial Term on the 5th day of
September, 1893, and speaks as of that date. It is not dis-
closed by this record that there were any negotiations between
the parties looking to the abandonment of the contract of
August 18th, 1891, after that time. The abrogation of the
contract was one of the issues clearly presented to the court
in the equity suit and its determination is final so far as the
defendant is concerned. This action was begun in October,
1892, and it is not disclosed that there were negotiations
between these parties after that time as to any transactions in
this case.

The equity judgment adjudges among other things that William failed to purchase Read's stock because the latter refused to sell; this notwithstanding Edward's allegation in his pleading that William refused to purchase any more of Read's stock than the 500 shares.

The question whether there was a breach of the contract by the failure to purchase all of Read's stock, even if it had been before the court, is a pure question of law, calling for the construction of the contract of August 18th, 1891.

The question as to the alleged absolute conveyance of certain West Virginia lands by Read to William is of no importance in this litigation. It is an open question whether a portion of the lands described in the deed, and the agreement accompanying the same, were taken as security or an absolute transfer. Construing them, for argument's sake, as amounting to an absolute conveyance of the property and the discharge of Read from his obligation to pay his two notes of $10,000 and $15,000, respectively, it only goes to reduce the amount of indebtedness for which William holds the 125 Hoffman House bonds. The same is true of the alleged failure to charge Edward as an indorser on the Read note for $10,000.

As we are of opinion that the construction of the agreement of August 18th, 1891, is an open one in this court; that the 125 bonds are held as collateral security for the performance of the guaranties of William, assumed or created by the contract in question, and also for the other indebtedness referred to in the sixth subdivision of the agreement, as well as against any foreclosure of the Hoffman House mortgage, the same having taken place according to the record, it follows that the 125 bonds are held for purposes other than as collateral security for the payment of the notes in suit, and that there was no question to submit to the jury. This being so, it follows that the trial judge was justified in directing a verdict for the plaintiff.

The order of the Appellate Division sustaining the exceptions taken at the trial and directing a new trial should be

reversed and an order should be granted directing that a judgment be entered upon the verdict directed at the trial, with costs in all the courts.

O'BRIEN, HAIGHT, MARTIN and VANN, JJ., concur; PARKER, Ch. J., and GRAY, J., dissent.

Ordered accordingly.