In the Matter of the Estate of THOMAS BENEDICT CLARKE, Deceased.

Surrogate's Court, New York County, February 15, 1938.

*Sapinsley & Lukas* [*Alvin P. Sapinsley* of counsel], for Eleanor Clarke, life tenant, objectant.

*H. Walter Reynolds*, for Mary Ellen Keys, life tenant, objectant.

*Barr, Robbins & Palmer,* for the City Bank Farmers Trust Company, petitioner.

*Deiches & Bernson* [*Maurice Deiches* and *Murray S. Kaplan* of counsel], for Clarence J. Dearden, claimant.

*Laughlin, Gerard, Bowers & Halpin,* for Adelaide Keys Metcalfe, etc., objectant.

*Arthur Butler Graham,* special guardian for William Anderson Keys, objectant.

*Hyman Chipkin,* for Pauline S. Merrifield, objectant.

*Harold A. Content,* for Walter Hamilton du Moulin, as executor, etc., of Ruth du Moulin, deceased, objectant.

*Stedman & Stedman,* for Adrian W. Mather, as executor, etc., objectant.

*McKercher & Link,* for the Fifth Avenue Hospital.

*Louis Bevier,* for the National Academy of Design.

*John F. Middlemiss,* for Elizabeth Stoddert Roeder, objectant.

FOLEY, S. The general issues in the proceeding for the judicial settlement of the account and for the construction of certain provisions affecting the remainder interests under the testamentary instruments have been determined by my decision filed simultaneously herewith.

There remain for disposition certain questions presented by the second supplemental petition of the executor in the accounting proceeding. In its first supplemental petition the executor sought the instructions of the court as to the propriety, price, manner and time of sale of a certain collection of paintings. That proceeding came on before Mr. Surrogate DELEHANTY. A referee was appointed to inquire into these questions. Recommendation was made by him in his report that the paintings be sold at private sale in accordance with the terms of a contract which was approved by all of the parties who had appeared in the proceeding. The surrogate ratified the contract and directed the executor to carry out its terms for the sale of the paintings. The sale was consummated. On February 5, 1936, the corporate executor received in cash as the proceeds of the sale the sum of $530,000. It thereupon made substantially complete payment of the pecuniary legacies and set up in full the pecuniary trusts. The money legacies aggregated the sum of $335,000. The testamentary instruments, in addition, directed the setting up of three trusts of $50,000 each for Mary Ellen Keys, a sister of the testator, for William Addison Clarke, a brother, and for Eleanor Clarke, a sister-in-law. Small annuities

were provided for the benefit of two other persons. The residue of the estate was disposed of in varying fractions. One-half was given in trust for the benefit of Thomas Benedict Clarke, Jr., the son of the testator; shares of one-eighth were directed to be added to the Mary Ellen Keys trust, to the William Addison Clarke trust and to the Eleanor Clarke trust above referred to. The remaining one-eighth was given outright to two nieces.

Two general questions are presented for determination:

(1) A novel question in this State, since the research of counsel and of the surrogate has disclosed no prior decision on the exact point as to whether there shall be an apportionment of the net proceeds of the sale of the testator's collection of paintings between principal and income of the residuary trusts. In this connection, shall the rule in *Lawrence* v. *Littlefield* (215 N. Y. 561) there applied to the apportionment of the proceeds of the sale of unproductive real property, be here applied to the proceeds of the sale of unproductive tangible personal property? Incidental to these questions, if apportionment be decreed, how shall carrying expenses be charged?

(2) Shall interest be allowed on the outright pecuniary legacies from one year after the date of the issuance of letters, and, if so, at what rate?

(1) In the solution of the first question the tests imposed are the intent of the testator as expressed in the will, the character of the trust property and its extent as compared to the other assets of the estate, and the relationship to the testator of the beneficiaries, as preferred objects of his bounty. (*Matter of Rowland,* 273 N. Y. 100.)

Mr. Clarke was for many years engaged in the business of the collection and the sale of paintings and objects of art. His business activities were conducted in part individually and in part through a corporation known as The Art House, Inc., of which he was the sole stockholder. At the time of his death he owned a collection of 175 paintings, known as " The Thomas B. Clarke Collection of Portraits by Early American Artists." Subsequent to his death, the corporation was dissolved and the liquidation of all the paintings was taken over by the executor.

His will contained a mandate for the sale of all of his property, including the paintings. In this regard article second reads as follows: " I direct my Executor to convert into money all of my estate, both real and personal, * * * . It is my wish that my Executor shall exercise its judgment as to the time and manner of effecting the sale of my property, and I advise my Executor to consult with my son Thomas Benedict Clarke, Jr., with my friend James W. Ellsworth, Esq., and with Mr. Clarence J. Dearden and

Miss Alice T. Bay, President and Treasurer respectively of The Art House, Inc., as to the disposal of my artistic effects."

An unimportant modification of these provisions was made by the second codicil as to the persons whose advice was to be sought by the executor. Plainly the testator anticipated delay in the ultimate liquidation of his collection. Nevertheless, the direction to convert into money within a reasonable time after death is clearly expressed. Illuminative of this intent is the opening sentence of article third. It reads: " Out of the proceeds of the sale of the property referred to in Article Second * * * I direct that the following payments be made." Then follow the dispositive provisions for the legacies and pecuniary trusts.

The greater part of the outright legacies bequeathed by the testator was given to preferred relatives. The beneficiaries of the pecuniary and residuary trusts were likewise favored kin. To his only son and only surviving child, Thomas Benedict Clarke, Jr., he gave $250,000 by way of an outright legacy. That sum was approximately seventy-five per cent of the total gifts within that class. The son was likewise the life tenant of one-half of the residuary estate.

The last codicil to the testator's will was executed nine days before his death. By express provision that codicil republished, ratified and confirmed his will as modified by the first codicil. With his background of experience as a dealer in art and with his unquestioned familiarity with conditions during the depression, which had then continued for a substantial period of time, he must have anticipated slowness in the realization of cash applicable to the benefits which he had given under his will and codicils, and that delay in payment would inevitably ensue. These and other circumstances strongly evidence the purpose that his beneficiaries, particularly the life tenants of the residuary trusts, should be protected by an ultimate apportionment of the proceeds of the sale of the paintings.

Additional indication of his intent is found in the nature and relative importance of the assets constituting his estate. His collection of paintings was the largest and most valuable portion of his properties. It was appraised for tax purposes at approximately the sum of $1,000,000. The entire assets were valued at approximately $1,800,000. It is observable from the account and supplemental account that the proceeds of sale of the paintings constituted almost one-half of the realizable assets.

It is urged by those opposed to an apportionment that no decision in the courts of our State has decreed an allocation between principal and income of the proceeds of the conversion of unproductive

personal property. This absence of precedent, however, does not constitute a bar to the relief which equity should grant. The line of cases, which authorize the apportionment of the proceeds of unproductive real estate, from *Lawrence* v. *Littlefield* (215 N. Y. 561) to *Matter of Rowland* (273 id. 100), furnishes, in the basic reasons set forth in those decisions, authority for a similar method of allocation of the funds derived from the conversion of unproductive personalty. The very basis of the decisions in *Lawrence* v. *Littlefield* (*supra*) and the succeeding cases, was a finding of the express intent of the testator to effect an equitable conversion of the realty into personalty. If, as a basis for apportionment, the courts were required to find or were to struggle to find an intent to convert the property from realty to personalty, it is obvious that apportionment should be applied to unproductive personal property where the fiction of equitable conversion was not required to be invoked because of the inherent nature of the assets.

The declared objective of all of these decisions was the ascertainment of a purpose on the part of the testator that the life tenant should not be deprived of income by delay in the liquidation, to the resulting benefit of the remaindermen. In the leading case of *Lawrence* v. *Littlefield* (*supra*), Judge HISCOCK, in reaching his conclusion that an apportionment must be decreed, discussed with approval several decisions in other jurisdictions where unproductive personalty, and not unproductive realty, was the subject of dispute. In his opinion he pointed out that apportionment was directed after the sale of the assets in *Taylor* v. *Clark* (1 Hare [1841], 161; S. C., 66 Eng. Rep. 990) where personal property was involved consisting of an interest in a partnership, which the executors were able to sell only after the lapse of some years; in *Kilvington* v. *Gray* (2 Sim. & Stu. 396), where personal property was directed to be converted and the proceeds invested in realty; in *Wilkinson* v. *Duncan* (23 Beav. [1857] 469), where the asset consisted of a pecuniary reversionary interest; and in *Sargent* v. *Sargent* (103 Mass. 297), which involved a case of the conversion of unproductive bonds as soon as possible after the testator's death.

An early decision indicative of the attitude of the courts on the principle of apportionment may be found in *Matter of Housman* (4 Dem. 404). There the executors retained for several years household furniture and rented such furniture, together with the house in which it was located. Necessarily this method enhanced the rent ordinarily derivable from an unfurnished dwelling. Surrogate ROLLINS held that the delay in making the conversion directed by the will " should not enure to the advantage of the

beneficiaries for life as against the remaindermen, or to the advantage of the latter as against the former, but to the advantage of the estate as a whole, and the equities should be adjusted between the successive takers."

It is argued further that the extension of the rule of apportionment to the allocation of the proceeds of unproductive personalty might lead to unnecessary complications in the administration of the ordinary estate or require an apportionment of the proceeds of tangible personal property of relatively small value. It is urged, for example, that the library of the testator or his yacht, or furniture, jewelry, or other non-income yielding personal property might be required to be apportioned in every estate. Necessarily, no general rule directing an apportionment should be made as to ordinary personalty. The determination in the present estate is based upon the peculiar and distinctive character of the collection of paintings, the expression of intent, the surrounding circumstances of the will, the close relationship of the beneficiaries, and, finally, the magnitude of the asset as compared with other assets of the estate.

In the Restatement of the Law of Trusts it is enunciated: " Section 240. Unproductive Property. " Unless it is otherwise provided by the terms of the trust, if property held in trust to pay the income to a beneficiary for a designated period and thereafter to pay the principal to another beneficiary produces no income or an income substantially less than the current rate of return on trust investments, and is likely to continue unproductive or underproductive, the trustee is under a duty to the beneficiary entitled to the income to sell such property within a reasonable time."

In the comment to this section, this rule is declared to apply to chattels which are not productive as well as to unproductive land.

The conclusion necessarily follows here that an apportionment must be decreed.

Contention has also arisen in this proceeding as to time and method of such apportionment. The following directions are made by the surrogate:

(a) The general rule is that where a conversion is directed, it must be held to have occurred within a reasonable time after the testator's death. (*Lawrence* v. *Littlefield, supra.*) The appropriate date of presumed conversion here I hold to be January 28, 1932, one year after the date of the issuance of letters to the executor. Apportionment between life tenant and remaindermen of the residuary trusts must then begin. The income to be paid to the life beneficiaries must, therefore, be computed from that date. (*Furniss* v. *Cruikshank,* 230 N. Y. 495.)

(b) In the ascertainment of the amount of the fund to be apportioned, the net proceeds of the sale only are to be considered. All expenses directly connected with the sale of the paintings must be deducted from the gross proceeds of sale before the amount, subject to further computation, is arrived at.

(c) The expenditures for storage charges and insurance of the paintings for the period of one year after the issuance of letters must be charged against income. Thereafter, the cost of storage and insurance or expenses for the maintenance of the paintings must be charged against prinicpal. (*Matter of Rowland*, 273 N. Y. 100; *Furniss* v. *Cruikshank, supra,* as modfd. in 231 id. 550; *Matter of Satterwhite*, 262 id. 339; *Spencer* v. *Spencer*, 219 id. 459.)

(d) In accordance with the rule laid down in *Lawrence* v. *Littlefield* ,in applying apportionment, income will be allowed at the rate of four per cent, which I hold to be the average rate earned upon legal investments during the period from January 28, 1932, the presumed date of conversion by sale, to the date of the actual sale upon February 5, 1936.

(e) The apportionment should be made in accordance with the formula prescribed in section 241 of the Restatement of the Law of Trusts. (*Matter of Rowland, supra.*)

(f) Income upon the pecuniary trusts (as distinguished from the residuary trusts) is directed to be computed at the rate of four per cent from the date of death. (*Matter of Stanfield,* 135 N. Y. 292; *Matter of Bird*, 241 id. 184.)

(2) Upon the second phase presented, I hold that the general legatees are entitled to interest at the rate of four per cent from one year after the issuance of letters testamentary upon the unpaid balances due them. The testator died before the period for the payment of legacies was changed from one year to seven months after the date of the issuance of letters. Section 218 of the Surrogate's Court Act was amended to reduce the period by chapter 562 of the Laws of 1931. It took effect on April 21, 1931, after the death of the testator. The one-year period rather than the seven months' period, therefore, applies. (*Matter of Kent*, 146 Misc. 155; *Matter of Stumpp*, 153 id. 92.) The terms of the testamentary instruments and the circumstances surrounding their execution compel the conclusion that the testator intended that interest should be paid for the period of deferment. The larger part of these legacies was given to the special objects of his solicitude. His son received the greatest amount, $250,000. No distinction may be made in the treatment of the members of the class of legatees, and all are entitled to interest.

The rule in *Matter of Benson* (96 N. Y. 499) has no application to this estate since the income actually earned on the assets during the period of the first year became applicable to the payment of the legacies and pecuniary trusts, and never could become part of either the tentative or the true residue. The deficiencies in the legacies were required to be made up from the proceeds of the sale of the art collection. The shares of the respective residuary legatees, whether outright or in trust, are the same whether income actually earned was included or excluded from the computation. The rights of the *cestuis* of the residuary trusts have been adequately protected by the direction for apportionment made in the prior part of this decision. In this disposition the surrogate had in mind that the rule in *Matter of Benson (supra)* was repealed by the enactment of section 17-b of the Personal Property Law, which became effective after the date of death of the testator. His determination, however, has been based upon the inapplicability of the rule to the special circumstances of this estate.

A single decree may be submitted on notice disposing of the issues determined by this decision and by the decision filed simultaneously herewith, upon the referee's report and upon the construction of the will. With the proposed decree, counsel for the executor are directed to serve and file their proposed computations required by this decision. The other parties in interest are granted leave to serve cross-computations within ten days thereafter. Proceed accordingly.