In the Matter of the Accounting of REBECCA BECHER et al., as Executors of JACOB BECHER, Deceased.

Surrogate's Court, Kings County, July 22, 1953.

*Samuel C. David* for executors, petitioners.

*Rand R. Eisberg* for Rebecca Becher, respondent.

*Oscar A. Lewis,* special guardian.

RUBENSTEIN, S. The main issue herein is whether the widow possesses a right of election against testator's will, pursuant to the provisions of section 18 of the Decedent Estate Law.

Testator's will is dated July 27, 1938. He died August 15, 1948, and letters testamentary issued on October 5, 1948, to the three nominated executors, testator's older son, his widow and his attorney. Testator was also survived by another son and two daughters.

The dispositive provisions of the will are few and simple. Under paragraph " Second " thereof testator gave to his widow household furniture, wearing apparel, automobiles, etc., and other articles of personal use or adornment. None of such

articles is listed in the accounting schedules. Under paragraph " Third " testator bequeathed all his shares of stock in three corporations, in trust during the widow's life, with equal distribution of the dividends therefrom to the widow and two sons. Upon the widow's death, the trust corpus is to be distributed between the two sons " so that   *   *   *   each — will own an equal number of shares ", after such distribution, including any shares of stock owned by them just prior to such distribution.

In paragraph " Fourth " of his will, testator expressed the wish that the businesses represented by the stockholdings so bequeathed be continued by at least one of the sons, and gave detailed suggestions for the attainment of that result as " I labored all my life to establish a successful business which I hope that my sons will continue." Paragraph " Fifth " provides that the residuary estate be converted into cash and one fifth thereof given absolutely to the widow, and the other four fifths placed in four equal separate trusts, one for each of testator's children.

When testator executed his will on July 27, 1938, he and his brother owned all the stock of the three corporations whose stocks were so specifically bequeathed. Testator and his brother then owned an equal number of shares in two of the corporations and testator owned two-thirds of the stock of Jacob Becher and Brother, Inc. (subsequently changed to Jacob Becher & Son, Inc.) and his brother the other one third. In or about January, 1939, the testator purchased his brother's stockholdings, thereby becoming the sole owner of all the issued capital stock of the three corporations.

In 1942, the testator by written agreement, gave to his sons an option to purchase from him a substantial block of the stock of the three corporations, which they exercised on December 27, 1945. On January 2, 1948, testator, his two sons and the three corporations entered into a stockholders' agreement, whereby testator and the sons limited their rights to dispose of their individual stockholdings. Paragraph 13 of that agreement provided that upon the death of a son, his stockholdings would be purchased by the remaining stockholders at book values and the purchase price therefor paid within eighteen months after death. Paragraph 14 of that same agreement provided, however, that upon testator's death " all the shares of stock possessed   *   *   *   at his death must be offered for sale and sold either to the respective corporations or to the parties of the second part (the sons) in equal amounts by the   *   *   *   execu-

tors '' and the sons agreed to equally purchase all of the stock at the book values of each corporation, payment therefor to be made in the manner therein specified. Paragraph 16 provided that the agreement should be binding upon the parties and their legal representatives.

All three corporations, after testator's death, exercised their purchase option under paragraph 14 of the agreement and acquired all of the testator's stock specifically bequeathed under his will. The sale price was approximately $380,000.

The other estate assets total approximately $99,000. Funeral and administration expenses, debts and estate taxes paid total approximately $77,000, thus leaving a balance of $22,000, exclusive of the stock proceeds. The expenses of this proceeding, additional attorneys' fees, taxes and assessments and executors' commissions are still to be paid, so that the amount of the residuary estate, if any there may be, is presently unknown. Some of the parties by computing executorial commissions upon the value of the stock specifically bequeathed exclude the possibility of any residuary estate.

It is contended that under the provisions of section 39 and section 40 of the Decedent Estate Law, the stock legacies bequeathed under paragraph '' Third '' of the will were revoked by the subsequent stockholders' agreement and that the proceeds from the sale of the stock falls into the residuary estate, and that the widow has a limited right of election under paragraph (f) of subdivision 1 of section 18 of the Decedent Estate Law to take outright the difference between the amount given to her under paragraph '' Fifth '' of the will (a one-fifth share of the residuary estate) and the amount of the widow's intestate share (one third of the net estate). To sustain the contention that the stockholders' agreement is '' wholly inconsistent with the terms and nature of such previous devise or bequest '' (Decedent Estate Law, § 40), it is pointed out (1) that upon the death of the testator, the agreement requires that his stock '' must be offered for sale and sold,'' while under the testator's will the stock was placed in trust during widow's life; (2) the will provides that dividends received on stock during the widow's life be paid equally to the testator's widow and two sons and that such provision is not present in the agreement. A provision of that nature would be superfluous in the agreement, however, as the right to receive dividends is determined upon record stock ownership (*Matter of Alling,* 186 Misc. 192).

It is further pointed out (3) that upon the widow's death, the sons will receive the shares of stock by way of gift under the will, whereas under the agreement, the sons (or the corporations which they control) must purchase and pay for said shares at the price and in the manner provided and (4) the will requires that upon the widow's death the stock shall be distributed so that each son will, after such distribution, own an equal number of shares, including shares owned just prior to such distribution, whereas the agreement requires the sons to purchase such shares " equally " without regard to their respective stockholdings. The agreement recites that each son, at the time of its execution, then owned an equal number of shares in all three corporations. What their holdings were at testator's death is not shown. The accounting herein shows, however, that interim the date of agreement and testator's death, testator's stockholdings in one of the corporations increased by 1,040 shares and by 1,066⅔ shares in another corporation and remained unchanged in the third corporation. It does not appear whether the additional stock was acquired by purchase either of original issue or from either or both sons, or by stock dividends.

The court agrees with the view that testator's primary testamentary intent was ultimately to transfer his stockholdings to the sons so that they could continue the business. But the court does not subscribe to the viewpoint that the testamentary gift of the stock in trust was nullified by the testator's prior sales of a substantial portion thereof in 1945 and the balance, after his death, under the agreement. Those sales were in furtherance of and effectuated the testator's primary intent at an earlier date and enabled the sons to obtain complete corporate control in their individual capacities. Were the stock retained as part of the trust under paragraph " Third " of the will, one of the sons, as trustee, would be hampered and restricted in the corporate management by his duty of undivided loyalty to the widow as an income beneficiary.

Testator's bequest was of " all the shares of stock which I may own at my death," not the number of shares which he owned at the time of the execution of the will. His two sons were then twenty-seven and sixteen years old and neither son then owned any stock. Testator then possibly contemplated the gift or sales of stock by his brother or himself to his sons, otherwise, he would not have provided that upon the termination of the trust under paragraph " Third " of the will, the stocks be distributed to the sons " So that  *  *  *  each will own an equal number of shares." The placement of the stock in trust

during the widow's life was evidently intended, among other things, to be the means whereby title would be held during the younger son's minority and a source from which the widow might possibly obtain a greater income than would be obtainable through usual trust investments, and at the same time the stock would be retained for ultimate ownership by the sons. The sale of the stock, pursuant to the agreement, however, did not revoke the bequest as the testator owned it at his death and the purchase price is substituted for the stock itself.

The gift of the stock is a specific legacy in trust (*Crawford* v. *McCarthy,* 159 N. Y. 514, 519; *Matter of Jay,* 189 Misc. 40). The rule of ademption relates only to specific legacies and is inapplicable when the subject of the legacy is existent at testator's death, and is not dependent upon the testator's intention (*Matter of Rubinstein,* 169 Misc. 273, 275 *et seq.* and cases cited).

The stockholders agreement whereby the parties agreed to sell and purchase the shares of stock of those who die is a valid contract (*Scruggs* v. *Cotterill,* 67 App. Div. 583; *Matter of Ruszkiewicz,* 41 N. Y. S. 2d 437, affd. 266 App. Div. 709). It was a contract to sell (Personal Property Law, § 82, subd. 1) and the property in the stock passed when the parties intended (Personal Property Law, § 99), which in this case occurred when the options were exercised by the corporations. Specific performance of the contract could be decreed, were there a breach by the trustees (Personal Property Law, § 149; Decedent Estate Law, § 37) if the sons tendered performance of their obligations to purchase.

In *Matter of Carrington* ([1932] 1 Ch. 1) it was held that ademption occurred where an option is exercised, after testator's death, upon shares of stock specifically bequeathed and that a conversion took place as of the date of the option. The holding in that case was based upon the case of *Lawes* v. *Bennet* (1 Cox Ch. 167) decided in 1785, the facts of which are set forth in *Rockland-Rockport Lime Co.* v. *Leary* (203 N. Y. 469, 478). The principles of equitable conversion were therein discussed and the court, at page 482, declined to follow the English rule of relation back and held "We hold that conversion was effected only from the date when conveyance became a duty and that it did not relate back to the date of the lease." That case involved a lease of realty and an option thereunder to purchase.

The case at bar does not involve the necessity of conversion of realty into personalty or vice versa, but rather is an attempt to spell out a conversion of one species of personalty into another species. The decision in the *Carrington* case is commented upon

by Simpson in "Equitable Conversion" (44 Yale L. J. 559, 569), as being "open to grave criticism not only as misapplying the principle of conversion but also as extending it beyond its proper bounds." In *Ray* v. *Fowler* (200 App. Div. 155, 163), it is stated, "equitable conversion is a mere fiction of equity resorted to only when it is necessary to determine ownership" and the application of its principles "should be resorted to only to obtain equitable results."

Paragraph 14 of the agreement requires that testator's stock "be offered for sale and sold either to the respective corporations herein or to the parties of the second part (the sons) in equal amounts" but the reciprocal requirement to purchase is confined to the sons who "agree to equally purchase all of said stock." The corporations could not validly agree to purchase the stock unless their surpluses were in excess of the prices to be paid (*Cross* v. *Beguelin,* 252 N. Y. 262; *Matter of Hubbell,* 302 N. Y. 246, 261). The stockholders' agreement, insofar as the testator and the corporations were concerned, was a unilateral contract, lacking mutuality of obligation, which would not have entitled the corporations to specific performance thereof (*Levin* v. *Dietz,* 194 N. Y. 376; *Stokes* v. *Stokes,* 148 N. Y. 708; *Dittenfass* v. *Horsley,* 177 App. Div. 143). The corporations' exercise of their option privileges changed a contingent right into a vested right, and became effective as of the date of exercise by analogy to the principles of conversion laid down in *Rockland-Rockport Lime Co.* v. *Leary* (*supra*); and that exercise occurred subsequent to testator's death.

Testator's stock was in existence at his death, and the trustees took title to it subject to the infirmity of the agreement (Decedent Estate Law, § 37) and were, likewise, entitled to take advantage of its benefits — the sale price, which equity cannot deny to them (*Van Tassel* v. *Burger,* 119 App. Div. 509; *Matter of Shymer,* 136 Misc. 334; *Matter of Tabbagh,* 167 Misc. 156, 161). The alteration in the form of the trust asset which resulted from the sale of the stocks was not a revocation of the bequest of such property (Decedent Estate Law, § 39), as the interest of income beneficiaries and remaindermen of the trust are capable of fixation; the corpus of the trust, upon its termination, being payable to the remaindermen upon the same basis as the purchase price paid for the stock.

The agreement provides that the sale price shall be paid to the testator's representative by "a down payment equal to the sum of twenty (20%) percent of the value of said stocks and the remaining balance payable over a period of five (5) years there-

after in equal quarter annual installments *without interest.*" (Emphasis supplied.) Stockholders' contracts fixing the values and mode of payments are valid (*Matter of Miller*, 191 Misc. 784; *Matter of Ruszkiewicz, supra*). The mode of payment so provided in this contract, however, deprives the trust of the benefit of obtaining income on the full purchase price for a period of five years.

As stated above, the sale price was approximately $380,000, and the residuary estate approximately $22,000, less additional administration expenses to be paid therefrom. In no event will the residuary estate, if there be any, be more than 5% of the net estate, so that the stock represents a minimum of 95% of the net estate. If the stockholders' agreement did not specifically exempt the purchaser from payment of interest upon unpaid installments of the purchase price, the trust, with its provision for dividing the income thereof into three parts, one of which parts is unconditionally payable to the widow for life, would unqualifiedly meet the statutory requirement that it must be one " with income thereof payable to the surviving spouse for life " (Decedent Estate Law, § 18, subd. 1, pars. [b], [g]) or as it is also phrased, " a trust for  *  *  *  her benefit for life " (Decedent Estate Law, § 18, subd. 1, pars. [d], [e], [f]). The trust corpus for a period of five years will, however, be composed of assets, a portion of which cannot produce income. The statutory intent that the trust corpus be capable of producing income is indicated by the Decedent Estate Law (§ 18, subd. 1, par. [g]) which provides in part, as follows: " In the computation of the value of the provisions under the will the capital value of the fund or other property *producing the income* [emphasis supplied] shall be taken and not the value of the life estate."

Assets left by testators to wholly or partially form trusts for their surviving spouses or others frequently and of necessity are of a nature that do not produce income and are incapable of immediate sale so that the proceeds therefrom may be invested and income obtained. The presence of nonincome-producing securities in a trust, however, does not entitle the surviving spouse to an absolute right of election to take an intestate share (*Matter of Ryan*, 201 Misc. 632, mod. 280 App. Div. 410). The fiduciary is required, however, to make the assets productive for the benefit of the trust beneficiaries (*Matter of Ryan, supra*), and a delay by trustees " in failing to take any steps toward converting the corpus into income-producing assets within five years of the testatrix' death  *  *  *  were guilty of gross

negligence as a matter of law '' (*Matter of Hubbell,* 302 N. Y. 246, 258–259, *supra*). No claim is advanced that the trustees could or should have sold the unpaid installments for cash. Undoubtedly, if they were sold, their price would be considerably discounted.

The widow is entitled to receive income from a trust not only adequate in form but also in substance to produce a reasonable income in proportion to its assets (*Matter of Schrauth,* 249 App. Div. 846; *Matter of Clark,* 275 N. Y. 1; *Matter of Mayers,* 184 Misc. 413, affd. 269 App. Div. 1027) and it must be a substantially beneficial trust (*Matter of Wittner,* 301 N. Y. 461, 464). Courts have no right to vary or modify the terms of a will to bring a gift to the spouse within the provisions of section 18 of the Decedent Estate Law (*Matter of Wittner, supra,* p. 465). That principle of law is not violated by holding that upon the face of the will, the trust is adequate in form and does not entitle the widow to an absolute right of election against it; that the beneficial nature of the trust is disclosed by the trust provision and the testator's intent that the widow is to be an income beneficiary thereof. That intent remained unchanged by the stockholders' agreement and the exchange, after testator's death, of the stock for part cash and the promise to pay the balance within five years. The exchange did not convert the nature of the asset left by the testator, but did change a portion of it from a security capable of producing income into a chose in action incapable of producing income. That result was a condition created by the testator, which to all practical purposes, existed at his death. It was not brought into existence by any affirmative act upon the part of the trustees, and did not arise as a consequence of events uncontrolled by testator and subsequent to his death. It is as though, therefore, the testator bequeathed, as part of the trust, an unproductive asset.

A consideration of the character of the trust property and its extent as compared with other estate assets, the relationship of the testator to the three trust beneficiaries as the preferred objects of his bounty indicates clearly that the testator intended that they be protected and benefited by apportionment of the proceeds between income and principal of the purchase installments as they became due (*Matter of Clarke,* 166 Misc. 807; *Matter of Hovelaque,* 176 Misc. 869; *Matter of Pennock,* 285 N. Y. 475) as those installments are the substitutes of the stock which were to have been the source of income. In applying apportionment, income will be allowed at the rate of 3%, which, in the absence of proof, the court determines to be the average rate

earned upon legal investments from February 1, 1950, the date upon which the option was apparently exercised, according to Schedule A-1 of the account, to February 1, 1953, during which period some installments were to have been paid. If some installments are still unpaid the same rate of income shall apply thereto. But if there be disagreement among the parties as to the rate fixed herein an application may be made to the court for determination of such controversy. The apportionment should be made in accordance with the formula prescribed in section 241 of the Restatement of the Law of Trusts (*Matter of Rowland*, 273 N. Y. 100).

The suggestion has been advanced that the widow's share of income in each apportionment of the proceeds should be deducted equally from the principal of the two trusts theoretically created for the two sons, so that her trust would always remain constant. A determination of that nature would create a greater right in the widow than would be obtainable were the stock retained, as the vast majority of trusts are subject to fluctuations both in the value of their *corpora* and the income produced. By the application of these principles of apportionment, the widow will, therefore, receive the irreducible minimum of income to which she is entitled (*Matter of Bommer*, 159 Misc. 511, 520–521) and not an illusory gift (*Matter of Curley*, 245 App. Div. 255, affd. 269 N. Y. 548), the trust is preserved, and the testator's intention effectuated.

Schedule A of the account does not list as estate assets any household furniture, wearing apparel, automobiles, jewelry, etc., items which were specifically bequeathed to testator's widow under paragraph " Second " of the will. Presumably if there were any such items they were not considered as estate assets and were set off to the widow as exempt property under the provisions of section 200 of the Surrogate's Court Act. No necessity exists, therefore, for a determination that the gifts under paragraph " Second " of the will shall abate if the residuary estate be exhausted before the payment of all administration expenses and taxes.

If there be no residuary estate, the value of so much of the items bequeathed to the widow under paragraph " Second " of the will, which do not qualify for the exemptions provided under section 200 of the Surrogate's Court Act, shall be computed, and if the total equals or exceeds $2,500, the outright gift satisfies the statute, but if it be less, the widow will be entitled to receive the difference in cash from the principal of her trust (*Matter of Jackson*, 177 Misc. 480, affd. 264 App. Div. 783, motion

for leave to appeal denied 264 App. Div. 873). If on the other hand, however, there be a residuary estate, the widow is entitled to an outright bequest of one fifth thereof under paragraph "Fifth" of the will. The value of the nonexempt property bequeathed to the widow under paragraph "Second" together with the residuary bequest shall then be combined, and if the total does not equal one third of the residuary estate, the widow shall be entitled to a limited right of election to the difference from the residuary estate, and if the sum total of such benefits be less than $2,500, the difference shall be deducted from the corpus of the widow's aliquot part of the trust and paid to her in cash (Decedent Estate Law, § 18, subd. 1, par. [e]). The widow is also entitled to her prorata share of the income earned from the date of death (*Matter of Curley,* 160 Misc. 844).

In passing it should be observed that under the stockholders' agreement, paragraph 15 thereof, the surviving widow of a deceased stockholder or his estate is entitled, for a period of one year from the date of death, to payment from the corporations of the same remuneration or compensation which shall be received by the remaining stockholders. The testator's widow received the sum of $34,500 under that provision.

Construction is requested of paragraph "Eleventh" of the will wherein testator provides: "I hereby direct that any and all estate or inheritance taxes which may be imposed against any one of the legacies herein created shall be paid out of the general estate." The term "general estate" as here employed is the equivalent of "my residuary estate" (*Chase Nat. Bank* v. *Tomagno,* 172 Misc. 63, 65–66) and the intent that testamentary benefit shall be exonerated from taxes is clearly expressed (*Matter of Mills,* 189 Misc. 136, 142, affd. 272 App. Div. 229, affd. 297 N. Y. 1012; *Matter of Liebovitz,* 197 Misc. 123). The directions do not, however, evidence any intent to vary the statutory rule of apportionment as to nontestamentary property, hence such property shall bear its prorata share of taxes under section 124 of the Decedent Estate Law (*Matter of Lemmerman,* 199 Misc. 49, and cases cited).

Proceed accordingly.